Todd M. Friedman (216752)
Adrian R. Bacon (280332)
Matthew R. Snyder (350907)
Law Offices of Todd M. Friedman, P.C.
21031 Ventura Blvd., Suite 340
Woodland Hills, CA 91364
Phone: 323-306-4234
Fax: 866-633-0228
tfriedman@toddflaw.com
abacon@toddflaw.com
msnyder@toddflaw.com
Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MIGUEL ESPARZA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CHARTER COMMUNICATIONS INC., a Delaware corporation d/b/a SPECTRUM.COM,<br><br>Defendant. | Case No. 2:25-CV-02438-JLS-PVC<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT ("CIPA")** |

I. INTRODUCTION

Californians increasingly conduct their lives and activities over the Internet, sharing often sensitive personal information with companies by using company websites rather than landline telephones.

Defendant created its own online presence at spectrum.com (the "Website") to communicate with potential customers, encouraging engagement with this electronic medium – Defendant's Website -- as an alternative to the telephonic or in-person interaction. Defendant did this to enable potential customers to obtain information from and about Defendant's products, and to enable Defendant to elicit information from potential customers about their specific needs and desires.

Defendant well understands that its Website is a means to communicate privately with potential customers – a consumer expectation that is not only reasonable, but actively nurtured by Defendant. Indeed, Defendant assures visitors that *"[y]our privacy is important to Charter"* and *"[w]e value the trust you place in us."* See https://www.spectrum.com/policies/privacy-policy (last accessed December 2024).

Defendant's promise is false. In reality, Defendant secretly allows a third-party spyware company to eavesdrop on the private conversations of everyone who communicates through the chat feature on the Website. The spyware company then exploits and monetizes that data in violation of the second clause of section 631(a) of the Penal Code.

Dozens of state and federal courts have held that substantially identical conduct violates the California Invasion of Privacy Act ("CIPA").

II. JURISDICTION AND VENUE

1. This Court has jurisdiction pursuant to the Class Action Fairness Act ("CAFA").

2. Venue is proper in this Court because Defendant removed this action from the Los Angeles County Superior Court, which is within this judicial district.

### III.  PARTIES

3.  Plaintiff is a resident and citizen of California. While physically within California within the statute of limitations period, Plaintiff visited Defendant's Website and conducted a brief conversation through the Website's chat feature, sharing personal information in the process. Plaintiff was not advised that the chat was monitored, intercepted, or recorded.

4.  Defendant is a Connecticut-based company that sells phone, TV, and internet access solutions via its website. Defendant also owns, operates, and controls the above website.

### IV.  FACTUAL ALLEGATIONS

**Background of CIPA**

5.  CIPA prohibits wiretapping and eavesdropping of electronic communications without the consent of all parties to the communication. "'[T]he right to control the nature and extent of the firsthand dissemination of [one's] statements'" is viewed by the California Supreme Court "as critical to the purposes of Section 631[.]" *Javier v. Assurance IQ, LLC*, 2023 WL 114225, at *6 (N.D. Cal. Jan. 5, 2023) (Breyer, J.) (quoting *Ribas v. Clark*, 38 Cal. 3d 355, 361 (1985)); *Ribas*, 38 Cal. 3d at 360-61 ("a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device"). "[U]nder Section 631, it has always mattered who is holding the tape recorder[.]" *Javier*, 2023 WL 114225, at *6.

6.  Compliance with CIPA is easy, and most website operators comply by conspicuously warning visitors if their conversations are being recorded, intercepted, or eavesdropped upon.

7.  Unlike most companies, Defendant ignores CIPA. Instead, Defendant enables and allows a third party that has no corporate affiliation with Defendant to eavesdrop on all such conversations. Why? Because, as one industry expert notes, "*Live chat transcripts are the gold mines of customer service….At your fingertips, you have valuable customer*

*insight to make informed business decisions. . . .When people are chatting, you have direct access to their exact pain points….*"). See https://www.ravience.co/post/improve-marketing-roi-live-chat-transcripts (last visited May 16, 2023) (emphasis added).

8. Defendant's actions are not incidental to facilitating e-commerce, nor are they undertaken in the ordinary course of business. To the contrary, as noted above, Defendant's actions violate industry norms and the legitimate, reasonable expectations of consumers.

**Defendant Pays A Third Party to Intercept Chats During Transmission.**

9. To enable the eavesdropping, Defendant secretly pays a third party company called "Asapp" to embed its chat technology code into the chat feature offered on Defendant's Website. Indeed, whenever a consumer chats via Defendant's Website, the chat is routed through Asapp's servers so they may simultaneously collect a transcript of that chat, along with other user data, in real time and save it for later access.

10. Asapp's product is a type of automatic routing software that automatically acquires and transmits user chat communications without any active input from either Defendant's employees, agents, or human representatives. Asapp acquires Website visitors' chat communications by first having its software route them to Asapp's own computer servers that it owns, controls, and maintains. The secret code enables and allows Asapp to secretly intercept in real time, eavesdrop upon, and store transcripts of consumers' chat communications they think they are having with Defendant, even when such conversations are private and contain personally identifiable information ("PII") – as Plaintiff did. Defendant neither informs visitors of this conduct nor obtains their consent to these intrusions.

11. At the time of Plaintiff's visit to the Website, the chat widget on the Website did not disclose that chats are conducted and surveilled by Asapp.

12. As shown by the below screenshot, Visitor PII and a tracking ID are sent to Asapp servers via a websocket connection:



13. Likewise, as shown by the below screenshot, chat transcripts are routed through Asapp servers:



14. One might reasonably wonder why Asapp would be interested in intercepting and recording the Website chat interactions between Defendant and unsuspecting visitors to Defendant's Website. There reason is money: Asapp's software is used to gather and

analyze customer data for targeted marketing campaigns. Both Defendant and Asapp profit from secretly exploiting the chat data through targeted social media advertising because "Targeted advertising allows brands to send different messaging to different consumers based on what the brand knows about the customer. The better a brand can demonstrate that it understands what its customers want and need, the more likely customers respond to advertising and engage with the brand…." *See* https://www.adroll.com/blog/what-is-targetedadvertising (last visited May 16, 2023).

15. Asapp does more than merely provide a storage function for Website users' chat communications with Defendant. It is more than the proverbial "tape-recorder" in the hand of Defendant. Instead, Asapp uses its record of Website users' interaction with Defendant's chat feature for data analytics and marketing/advertising to consumers – indeed, that is why Defendant pays Asapp for its software. Asapp is capable of using, and does use, the intercepted chat communications for its own purposes beyond simply supplying such communications back to Defendant.

16. Moreover, Asapp's chat technology is powered by artificial intelligence ("AI"), which allows Defendant to "Automate up to 90% of customer requests." https://www.asapp.com/products/generativeagent.

17. Through this chat technology, Defendant redirects the inputs made by users to its online chat system, in real time, from Defendant's own website to Asapp's chat technology platform.

18. Asapp then records the inputs made by users of Defendant's chat system, analyzes them using its AI language model to determine what response the chat bot should give, and then communicates that response back to Defendant's website.

19. The only reason Asapp is able to do any of this is because Defendant embedded the chat technology into its own website, and caused communications made to that chat bot to be routed to Asapp's chat technology platform. Had Defendant not done so, Asapp would never receive any data whatsoever. Defendant, thus enabled Asapp to record, compile, and analyze the communications of website users.

20. Asapp—at Defendant's direction—records every communication made to Defendant's chat system by a user, and then analyzes those communications.

21. On information and belief, Asapp independently uses the data collected through its chat technology platform—such as data from Defendant's chatsystem —to refine its AI language model.

22. Put more simply, the artificial intelligence model that powers all Asapp chat bots learns from the messages that consumers send to the chat bot. The AI model does so to better understand what customers are asking it, how to better resolve customer issues, and further streamline the chat bot function.

23. Defendant's Website's chat feature is powered by Asapp's own AI models, not by a model independently created or maintained by Defendant. All chat systems that utilize Asapp's platform similarly use Asapp's AI models.

24. The AI model is a "Self-improving" AI system that learns from interactions with Defendant's customers and its customer service agents. https://www.asapp.com/products/generativeagent

25. Certainly, Asapp advertises that its AI "models continue to learn from every interaction." https://www.asapp.com/solutions/real-time-agent-assist (emphasis added).

26. Asapp further advertises that its chat technology is easy to configure and install because it uses existing data and other information sources to set up the AI-based chat feature. https://www.asapp.com/products/generativeagent.

27. Plaintiff thus alleges that Asapp utilizes data collected from chats initiated on Defendant's Website to improve its own AI model.

28. Asapp's exploitation, monetization, use of, and interaction with the data it gathers through the chat feature on Defendant's Website in real time makes it a third-party interceptor and eavesdropper known to and enabled by Defendant under CIPA, rather than a mere extension or tool of Defendant and/or party to the communication with Website visitors.

29. Defendant is aware that this is what Asapp is doing with chat communications that Defendant routes to it. This information is not only publicly available, but serves as the entire basis of Asapp's services and business model. If Asapp did not work with the chat communications and data in this way, its services would be of no value and Defendant would not have contracted with it.

30. Upon information and belief, Defendant knowingly routes communications to Asapp, as discussed above, and knows that Asapp will analyze those chats and use the data for its own purposes.

31. Given the nature of Defendant's business, visitors often share personal and/or confidential data, in addition to personally identifying information, with Defendant via the Website chat feature. Plaintiff did so.

32. Within the statute of limitations period, Plaintiff visited Defendant's Website. Plaintiff – like all visitors – shared personal data and personally identifying information with Defendant via the Website chat feature.

33. Specifically, on or around August 21, 2024, Plaintiff utilized Defendant's chat feature on its Website. Plaintiff asked the chat feature several questions about what TV options are available for deaf people.

34. Defendant routed each of these inputs, instantaneously, to Asapp through the websocket as discussed above.

35. Asapp then recorded and analyzed the chat messages using its AI model, to determine how the chat bot should respond, and then routed the response back to Defendant's website to be displayed in the chat box for Plaintiff to read.

36. Defendant did not inform Plaintiff that Defendant was secretly aiding, agreeing with, employing, or conspiring with Asapp to intercept and eavesdrop on the conversations during transmission.

37. Defendant did not obtain Plaintiff's effective consent for the preceding intrusions, nor did Plaintiff know at the time of the conversation of Defendant's conduct.

38. An invasion of privacy, such as this, causes a concrete harm to consumers. "Violations of the right to privacy have long been actionable at common law." *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589, 598 (9th Cir. 2020). "A right to privacy encompasses the individual's control of information concerning his or her person." *Id.* (internal quotations and citations omitted). Stautes such as CIPA "codify a substantive right to privacy, the violation of which gives rise to a concrete injury sufficient to confer standing." *Id.*

39. By recording Plaintiff's communication without his consent, Defendant has invaded Plaintiff's privacy.

40. As a result of this invasion of privacy, Plaintiff has suffered an injury in fact.

41. The recording of Plaintiff's chat communications by Asapp through Defendant's assistance constitutes an invasion of privacy. Plaintiff felt upset, disturbed, and/or violated upon learning that Asapp had recorded his communications. This invasion of privacy constitutes an insult to Plaintiff's dignity.

42. Plaintiff and class members provided Defendant and Asapp with valuable information (the free recordings of the communications and other personal data) without their consent or knowledge.

43. Defendant and Asapp record the chat communications without consent to obtain valuable data from Plaintiff and class members. The entire purpose of CIPA is to provide California consumers with a means to pursue statutory damages for the breach of their privacy when a company records them without their knowledge. The judgment of the California Legislature indicates that the alleged violations of Plaintiffs' statutory rights under CIPA constitute concrete injury in fact. This conclusion is supported by the historical practice of courts recognizing that the unauthorized interception of communication constitutes cognizable injury.

44. Thus, Plaintiffs and putative class members "have provided valuable data to [Defendant] and have received no money in return." Brown v. Google LLC, No. 20-CV-03664-LHK, 2021 U.S. Dist. LEXIS 244695, at *52 (N.D. Cal. Dec. 22, 2021) (collecting

cases); see also Klein v. Facebook, Inc., 580 F. Supp. 3d 743, 803 (N.D. Cal. 2022) ("[B]y providing Facebook with their information and attention, they 'lost money or property.'").

## V. CLASS ALLEGATIONS

45. Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class") defined as follows:

> All persons who communicated with Defendant using the chat feature on Defendant's Website while physically located in California within the statute of limitations period.

46. NUMEROSITY: Plaintiff does not know the number of Class Members but believes the number to be at least 50. The exact identities of Class Members may be ascertained by the records maintained by Defendant.

47. COMMONALITY: Common questions of fact and law exist as to all Class Members, and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

a. Whether Defendant allowed Asapp to intercept and utilize transcripts of communications with class members;

b. Whether Defendant obtain effective and informed consent to do so;

c. Whether Plaintiff and Class Members are entitled to statutory penalties; and

d. Whether Class Members are entitled to injunctive relief.

48. TYPICALITY: As a person who conducted a chat with Defendant, Plaintiff is asserting claims that are typical of the Class.

49. ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in the class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

50. **SUPERIORITY**: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.

## VI.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT
### CAL. PENAL CODE § 631

51. Section 631(a) of California's Penal Code imposes liability upon any entity that "by means of any machine, instrument, contrivance, or in any other manner," (1) "intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system," or (2) "willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state" or (3) "uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section". Here, Defendant's third party chat provider violated the second clause of section 631(a) of the Penal Code, and Defendant violates the fourth clause or prong because it "aids, agrees with, employs, or conspires with" the Website's third party chat provider to allow such chat provider to intercept, eavesdrop upon, learn, share, and monetize the contents of Defendant's chat conversations.

52. Section 631 of the California Penal Code applies to internet communications and thus applies to Plaintiffs' communications with Defendant's Website. "Though written in terms of wiretapping, Section 631(a) applies to Internet communications. It

makes liable anyone who 'reads, or attempts to read, or to learn the contents' of a communication 'without the consent of all parties to the communication.' *Javier v. Assurance IQ, LLC,* 2022 WL 1744107, at *1 (9th Cir. 2022).

53. The spyware embedded into the chat feature of Defendant's Website to record and eavesdrop upon Plaintiff's communications qualifies as a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct alleged herein.

54. At all relevant times, Defendant intentionally caused the internet communication between Plaintiff and Defendant's Website to be intercepted during transmission and recorded. Defendant also aided, agreed with, employed, or conspired with Asapp to eavesdrop upon such conversations during transmission and in real time.

55. Plaintiff sent a pre-filing demand letter notifying Defendant regarding the combined wrongdoing of both Defendant and Asapp, but Defendant did not respond by taking remedial action to eliminate the wrongful conduct. At minimum, Defendant's conduct may be considered intentional because it had been made aware of its wrongdoing and the wrongdoing of its chat provider by the foregoing pre-filing demand letter, but has taken no remedial action to eliminate the wrongdoing. *See Doe v. Meta Platforms, Inc.*, 690 F. Supp. 3d 1064, 1076 (N.D. Cal. 2023) (Orrick, J.) (citing *Lopez v. Apple, Inc.*, 519 F. Supp. 3d 672, 684 (N.D. Cal. 2021) (White, J.) ("At the pleading stage, … interception may be considered intentional 'where a defendant is aware of the defect causing the interception but takes no remedial action.'") (quoting *In re Google Assistant Privacy Litig.*, 457 F. Supp. 3d 797, 815 (N.D. Cal. 2020) (Freeman, J.))).

56. In numerous materially identical cases, courts have held that the above-described allegations state viable claims for violations of section 631(a) of the Penal Code.

57. Therefore, Plaintiff and class members are entitled to the relief set forth below.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief against Defendant:

1. An order certifying the class and making all appropriate class management orders;
2. Statutory damages pursuant to CIPA;
3. Reasonable attorneys' fees and costs; and
4. All other relief that would be just and proper as a matter of law or equity, as determined by the Court.

**PLAINTIFF HEREBY REQUESTS A TRIAL BY JURY**

Dated: May 2, 2025         **LAW OFFICES OF TODD M. FRIEDMAN, P.C.**

By:   /s/ Todd M. Friedman
      Todd M. Friedman, Esq.
      Attorney for Plaintiff

# **CERTIFICATE OF SERVICE**

Filed electronically on May 2, 2025, with:

United States District Court CM/ECF system

Notification sent electronically on this May 2, 2025, to:

Honorable Josephine L. Staton
United States District Court
Central District of California

And all counsel of record as recorded on the Electronic Service List.

s/Todd M. Friedman
Todd M. Friedman