Todd M. Friedman (216752)
Adrian R. Bacon (280332)
Matthew R. Snyder (350907)
Law Offices of Todd M. Friedman, P.C.
21031 Ventura Blvd., Suite 340
Woodland Hills, CA 91364
Phone: 323-306-4234
Fax: 866-633-0228
tfriedman@toddflaw.com
abacon@toddflaw.com
msnyder@toddflaw.com
Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| MIGUEL ESPARZA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CHARTER COMMUNICATIONS INC., a Delaware corporation d/b/a SPECTRUM.COM,<br><br>Defendant. | Case No. 2:25-CV-02438-JLS-PVC<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT ("CIPA")** |

## I.    INTRODUCTION

Californians increasingly conduct their lives and activities over the Internet, sharing often sensitive personal information, data, communications, messages, and various other reports with companies by using company websites rather than landline telephones.

Defendant created its own online presence at spectrum.com (the "Website") to communicate with potential customers, encouraging engagement with this electronic medium – Defendant's Website -- as an alternative to the telephonic or in-person interaction.  Defendant did this to enable potential customers to obtain information from and about Defendant's products, and to enable Defendant to elicit information from potential customers about their specific needs and desires.

Defendant well understands that its Website is a means to communicate privately with potential customers – a consumer expectation that is not only reasonable, but actively nurtured by Defendant.  Indeed, Defendant assures visitors that *"[y]our privacy is important to Charter"* and *"[w]e value the trust you place in us."* See https://www.spectrum.com/policies/privacy-policy (last accessed December 2024).

Defendant's promise is false.  In reality, Defendant secretly allows a third-party spyware company to eavesdrop on the private conversations of everyone who communicates through the chat feature on the Website.  The spyware company then exploits and monetizes that data in violation of the second clause of section 631(a) of the Penal Code.

Dozens of state and federal courts have held that substantially identical conduct violates the California Invasion of Privacy Act ("CIPA").

## II.    JURISDICTION AND VENUE

1.    Defendant removed this case to federal court and contends that this Court has jurisdiction pursuant to the Class Action Fairness Act ("CAFA").

2.    Venue is proper in this Court because Defendant removed this action from the Los Angeles County Superior Court, which is within this judicial district.

SECOND AMENDED CLASS ACTION COMPLAINT

### III.    PARTIES

3.    Plaintiff is a resident and citizen of California.  While physically within California within the statute of limitations period, Plaintiff visited Defendant's Website and conducted a brief conversation through the Website's chat feature, sharing personal information in the process.  Plaintiff was not advised that the chat was monitored, intercepted, or recorded.

4.    Defendant is a Connecticut-based company that sells phone, TV, and internet access solutions via its website.  Defendant also owns, operates, and controls the above website.

### IV.    FACTUAL ALLEGATIONS

**A. Background of CIPA**

5.    CIPA prohibits wiretapping and eavesdropping of electronic communications without the consent of all parties to the communication.  "'[T]he right to control the nature and extent of the firsthand dissemination of [one's] statements'" is viewed by the California Supreme Court "as critical to the purposes of Section 631[.]" *Javier v. Assurance IQ, LLC*, 2023 WL 114225, at *6 (N.D. Cal. Jan. 5, 2023) (Breyer, J.) (quoting *Ribas v. Clark*, 38 Cal. 3d 355, 361 (1985)); *Ribas*, 38 Cal. 3d at 360-61 ("a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device").  "[U]nder Section 631, it has always mattered who is holding the tape recorder[.]" *Javier*, 2023 WL 114225, at *6.

6.    Compliance with CIPA is easy, and most website operators comply by conspicuously warning visitors if their conversations are being recorded, intercepted, or eavesdropped upon.

7.    Unlike most companies, Defendant ignores CIPA.  Instead, Defendant enables and allows a third party that has no corporate affiliation with Defendant to eavesdrop on all such conversations.  Why?  Because, as one industry expert notes, "*Live chat transcripts are the gold mines of customer service….At your fingertips, you have valuable customer*

*insight to make informed business decisions. . . .When people are chatting, you have direct access to their exact pain points….").* See https://www.ravience.co/post/improve-marketing-roi-live-chat-transcripts (last visited May 16, 2023) (emphasis added). Additionally, Defendant does this because it is cheaper to outsource its chat feature to a third party than it is to handle in-house.

8.    Defendant's actions are not incidental to facilitating e-commerce, nor are they undertaken in the ordinary course of business. To the contrary, as noted above, Defendant's actions violate industry norms and the legitimate, reasonable expectations of consumers.

**B. Defendant Pays A Third Party to Intercept Chats During Transmission.**

9.    To enable the eavesdropping, Defendant secretly pays a third party company called "Asapp" to embed its chat technology code into the chat feature offered on Defendant's Website.  Indeed, whenever a consumer chats via Defendant's Website, the chat is routed through Asapp's servers so they may simultaneously collect a transcript of that chat, along with other user data, in real time and save it for later access.

10.    Stated otherwise, on these communications, both Defendant and Asapp are present and are simultaneously sharing the contents of the conversations with one another, but this is not disclosed to the consumer, who is only aware that they are on a website owned and operated by Defendant and would only have reason to believe they are speaking with Defendant, not with two separate parties.

11.    Defendant utilizes Asapp's ASAPPMessaging platform to run the chat feature on its website.

12.    At the time of Plaintiff's visit to the Website, the chat widget on the Website did not disclose that chats are conducted and surveilled by Asapp.

### i.    How the ASAPPMessaging Platform Works

13.    The ASAPPMessaging platform is a customer service platform that utilizes artificial intelligence ("AI") to automate numerous facets of a business's customer service operations.  Below is a screenshot from Asapp's website describing the platform:

**SECOND AMENDED CLASS ACTION COMPLAINT**



14.    The entire ASAPPMessaging platform is hosted on Asapp's own servers, and not on servers that are owned or operated by Defendant.

15.    When a user interacts with the chat feature on Defendant's website, their Personal Identifying Information ("PII") and the tracking identifiers of the particular device they are using are instantaneously routed to the ASAPPMessaging platform, on Asapp's servers, via a websocket connection:

16.    When a user begins typing a message into the chat feature on Defendant's website, a keylogger—software installed by Defendant on its website—instantaneously

**SECOND AMENDED CLASS ACTION COMPLAINT**

routes each individual keystroke that a user inputs to the ASAPPMessaging platform, on
Asapp's servers:



17.     To be more specific, Asapp receives each individual character that a user types
into the chat feature on Defendant's website, as it is being typed.  A user does not need to
actually finish a message and choose to send it into the chat feature for Asapp to intercept
it.  In the above screenshot, the text typed by the user is visible in the highlighted line of
code: "params: {text: "Hi do you offer a tri", number: 4}." (emphasis added).  The message
that appears in this line of code is incomplete—the user has not finished typing their
message yet.  However, each individual key stroke was still instantaneously routed to the
ASAPPMessaging Platform on Asapp's servers (and, therefore, to Asapp).

18.     Once a user's inputs are routed to Asapp's servers, Asapp then records the
inputs made by users of Defendant's chat system and analyzes them using its AI language
model for numerous purposes, discussed more thoroughly in subsection ii, *infra*.

19.     How the chat feature responds to a user's inputs depends on the specific input
made by the user.  In some cases, the chat feature follows a pre-programmed computer

logic—provided to Asapp by Defendant—to supply back automated responses to the user, as indicated by the product tour on Asapp's website for the ASAPPMessaging platform:



20.    In other cases, including in the case of Plaintiff's chat with Defendant, a live agent of Defendant (that is, a human employee of Defendant) is connected to the chat to assist:

**SECOND AMENDED CLASS ACTION COMPLAINT**

21.    In either case, both Defendant and Asapp have simultaneous access to the chat conversation—either one can view and interact with the user of the chat feature through the ASAPPMessaging platform on Asapp's servers.  During all chats, it is the case that Asapp, Defendant and the consumer are all on the line at the same time, without any third party being disclosed to the consumer.

22.    The only reason Asapp is able to do any of this is because Defendant embedded the chat technology into its own website, and caused communications made to that chat bot to be routed to Asapp's chat technology platform.  Had Defendant not done so, Asapp would never receive any data whatsoever.  Asapp is thus not merely technology code akin to a tape recorder, but rather is more akin to a shadowly stranger sitting in the corner of the room hired by Defendant to secretly hold an interactive tape recorder and interact with Defendant's customers.

23.    Defendant, thus enabled Asapp to record, compile, and analyze the communications of website users.

24.    Asapp—at Defendant's direction—records every communication made to Defendant's chat system by a user, and then analyzes those communications.

### ii.    Capabilities of the ASAPPMessaging Platform

25.    Asapp does far more than merely record a user's chat inputs and supply pre-programmed responses back to the user.  Asapp is not merely programming code installed onto Defendant's website.  In fact, Asapp markets the ASAPPMessaging platform as "[s]o much more than a typical digital CX platform."  The below screenshot was taken directly from Asapp's website:

**SECOND AMENDED CLASS ACTION COMPLAINT**



26.    Certainly, Asapp provides "suggestions at every step of the conversation to resolve customer issues faster," and enables Defendant's own customer service agents to handle a larger volume of work by effectively outsourcing a host of customer service tasks to Asapp and its ASAPPMessaging platform:



27.    The ASAPPMessaging platform provides "live customer conversation analysis," and compiles substantial data on customer conversations for Defendant:

**SECOND AMENDED CLASS ACTION COMPLAINT**



28.    The ASAPPMessaging platform allows Defendant to "increase [its] capacity without adding staff," because the platform effectively outsources "up to 80% of Defendant's customer service representatives' responses":

29.    Asapp does this in a number of ways.  For example, using AI, it analyzes a user's chat messages and provides automated suggestions for responses that Defendant's customer service agents can use to quickly respond:[1]

_____

[1] The following series of screenshots were taken from Asapp's product tour for the ASAPPMessaging platform, available at: https://www.asapp.com/product-tours/asappmessaging.

SECOND AMENDED CLASS ACTION COMPLAINT



30.    Asapp also provides suggested completions to messages that Defendant's customer service agents manually type themselves.  In other words, Asapp literally finishes Defendant's agents' sentences:



**SECOND AMENDED CLASS ACTION COMPLAINT**

31.    Finishing Defendant's agents' sentences could not plausibly occur unless it is the case that both Asapp and Defendant were present at the same time during the communications.  This is akin to a supervising partner at a law firm handing sticky notes to assist a junior associate who is taking a deposition.  Both are present for the deposition, except in this case, the partner is hidden behind a curtain and is undisclosed to the deponent.

32.    Asapp can also provide agents with suggested pre-programmed logic flows for the chat feature to follow.  For example, if a customer sends a chat message stating that they wish to rebook a flight, a live person working for Defendant can simply click a button and Asapp will automatically output several chat messages allowing the customer to do so:







33. Asapp can similarly send chat users a form to input sensitive information, such as credit card information, at Defendant's agents' request:

1

2

3

4

5

6

7

8

9

10

11

12

13



14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



**SECOND AMENDED CLASS ACTION COMPLAINT**



34.     When a chat user submits sensitive information to one of these forms sent by Asapp, the information is not provided to Defendant, but instead is stored on Asapp's servers:



35.     Asapp will also automatically check in on a conversation with a chat user that has been stalling:





**SECOND AMENDED CLASS ACTION COMPLAINT**

36.    Similarly, Asapp will also automatically close a chat communication when Defendant's customer service agent asks it to wrap up the conversation:





**SECOND AMENDED CLASS ACTION COMPLAINT**

37.     Moreover, Asapp will provide detailed summaries of conversations that Defendant's agents have with chat users:



38.     Asapp also aggregates substantial amounts of data drawn from the chat feature for Defendant's review:



**SECOND AMENDED CLASS ACTION COMPLAINT**

1

2

3

4

5

6

7

8

9

10

11

12

13



14    39.    Finally, Asapp records transcripts of each chat conversation in Defendant's

15  chat feature for future review and reading by Defendant and/or its agents:

16

17

18

19

20

21

22

23

24



25

26

27

28

**SECOND AMENDED CLASS ACTION COMPLAINT**

40.    These conversation histories also include a summary of customer's
sentiments, a summary of the conversation itself, and disposition notes, all created by
Asapp:



41.    All of the actions described in paragraphs 24 through 40, *supra*, are done by
Asapp.

42.    Asapp analyzes users' chat communications—while Defendant's customer
service agents are also in the chat—and suggests responses for Defendant's agents.

43.    Asapp suggests to Defendant's agents how to complete their sentences as they
are typing.

44.    Asapp sends the messages to a chat user that are contained in an automated
flow.  Asapp

45.    Asapp sends the secure form to a chat user to submit sensitive personal
information, and then does not provide said sensitive information to Defendant's customer
service agents.

46.    Asapp sends the check in and closing messages once Defendant's agent
decides to hand off the conversation to it.

**SECOND AMENDED CLASS ACTION COMPLAINT**

47.    Asapp creates the detailed summaries of the chat communications between chat users and Defendant.

48.    Asapp aggregates the data collected from Defendant's chat feature.

49.    Asapp records the transcripts of chat users' communications with Defendant's customer service agents.

50.    The transcripts in addition to being eavesdropped in real time by two separate companies also are being transmitted between and disclosed to the two companies as well. These disclosures include the full contents of the intercepted communications, in violation of Subdivision (a) of Cal. Penal Code § 631.

51.    Defendant does none of these things.  Instead, it hired Asapp to do them.

52.    Plaintiff alleges, upon information and belief, that Defendant knows Asapp is doing all of these things.  It is precisely because Asapp is doing these things that Defendant hired Asapp in the first place.

**C. Plaintiff Uses Defendant's Chat Feature**

53.    Within the statute of limitations period, Plaintiff visited Defendant's Website.  Plaintiff – like all visitors – shared personal data and personally identifying information with Defendant via the Website chat feature.

54.    Specifically, on or around August 21, 2024, Plaintiff utilized Defendant's chat feature on its Website.  Plaintiff asked the chat feature several questions about what TV options are available for deaf people.

55.    Upon asking about TV options for deaf people, Plaintiff was connected with a live agent of Defendant (i.e., a human employee of Defendant).

56.    Defendant routed every input made by Plaintiff, instantaneously, to Asapp through the keylogger and websocket as discussed above, even while Defendant's live agent was also simultaneously in the chat feature communicating with Plaintiff.

57.    Asapp simultaneously recorded and analyzed the chat messages using its AI model, suggested responses for Defendant's agent, summarized the conversation, and

recorded and aggregated Plaintiff's personal data. Both Asapp and Defendant were on the line during the same communication with Plaintiff.

58.   Defendant did not inform Plaintiff that Defendant was secretly aiding, agreeing with, employing, or conspiring with Asapp to intercept and eavesdrop upon and disclose the conversations during transmission.

59.   Defendant did not obtain Plaintiff's actual, constructive, or implied consent for the preceding intrusions, nor did Plaintiff know at the time of the conversation of Defendant's conduct.

60.   An invasion of privacy, such as this, causes a concrete harm to consumers. "Violations of the right to privacy have long been actionable at common law." *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589, 598 (9th Cir. 2020). "A right to privacy encompasses the individual's control of information concerning his or her person." *Id.* (internal quotations and citations omitted). Statutes such as CIPA "codify a substantive right to privacy, the violation of which gives rise to a concrete injury sufficient to confer standing." *Id.*

61.   By recording Plaintiff's communication, disclosing Plaintiff's communication, and simultaneously eavesdropping on Plaintiffs' communication without his consent, and aiding and abetting Asapp in doing the same, Defendant has invaded Plaintiff's privacy.

62.   As a result of this invasion of privacy, Plaintiff has suffered an injury in fact.

63.   The recording of Plaintiff's chat communications by Asapp through Defendant's assistance constitutes an invasion of privacy. Plaintiff felt upset, disturbed, and/or violated upon learning that Asapp had recorded his communications. This invasion of privacy constitutes an insult to Plaintiff's dignity.

64.   Plaintiff and class members provided Defendant and Asapp with valuable information (the free recordings of the communications and other personal data) without their consent or knowledge.

65.   Defendant and Asapp record and eavesdrop upon the chat communications without consent to obtain valuable data from Plaintiff and class members. The entire

purpose of CIPA is to provide California consumers with a means to pursue statutory damages for the breach of their privacy when a company records them without their knowledge. The judgment of the California Legislature indicates that the alleged violations of Plaintiffs' statutory rights under CIPA constitute concrete injury in fact. This conclusion is supported by the historical practice of courts recognizing that the unauthorized interception of communication constitutes cognizable injury.

66.    Thus, Plaintiff and putative class members "have provided valuable data to [Defendant] and have received no money in return." *Brown v. Google LLC*, No. 20-CV-03664-LHK, 2021 U.S. Dist. LEXIS 244695, at *52 (N.D. Cal. Dec. 22, 2021) (collecting cases); see also *Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 803 (N.D. Cal. 2022) ("[B]y providing Facebook with their information and attention, they 'lost money or property.'").

## V.    <u>CLASS ALLEGATIONS</u>

67.    Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class") defined as follows:

> All persons who communicated with Defendant using the chat feature on Defendant's Website while physically located in California from one year prior to the filing of the original complaint through the date of class certification.

68.    Plaintiff additionally brings this action individually and on behalf of a subclass (the "Subclass") defined as follows:

> All members of the Class who were connected to a human employee of Defendant while using the chat feature on Defendant's Website.

69.    NUMEROSITY: Plaintiff does not know the number of Class and Subclass Members but believes the number to be at least 50.  The exact identities of Class and Subclass Members may be ascertained by the records maintained by Defendant.

70.    COMMONALITY: Common questions of fact and law exist as to all Class and Subclass Members, and predominate over any questions affecting only individual members of the Class and Subclass.  Such common legal and factual questions, which do not vary between Class and Subclass members, and which may be determined without

reference to the individual circumstances of any Class and Subclass Member, include but are not limited to the following:

    a.    Whether Defendant allowed Asapp to intercept and utilize transcripts of communications with class members;

    b.    Whether Defendant obtained actual, constructive, implied, effective and/or informed consent to do so;

    c.    Whether Plaintiff and Class and Subclass Members are entitled to statutory damages; and

    d.    Whether Class and Subclass Members are entitled to injunctive relief.

71.    TYPICALITY: As a person who conducted a chat with Defendant, Plaintiff is asserting claims that are typical of the Class.

72.    As a member of the Class who was connected to a human employee of Defendant while utilizing the chat feature on Defendant's website, Plaintiff is asserting claims that are typical of the Subclass.

73.    ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class and Subclass. Plaintiff has retained attorneys experienced in the class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

74.    SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class and Subclass Members is impracticable and inefficient. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.

## VI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT
### CAL. PENAL CODE § 631

75.    Section 631(a) of California's Penal Code imposes liability upon any entity that "by means of any machine, instrument, contrivance, or in any other manner," (1)

"intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system," or (2) "willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state" or (3) "uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section". Here, Defendant's third-party chat provider—Asapp—violated all three clauses section 631(a) of the Penal Code, and Defendant violates the fourth clause or prong because it "aids, agrees with, employs, or conspires with" Asapp to enable such violations of section 631(a).

76. Section 631 of the California Penal Code applies to internet communications and thus applies to Plaintiffs' communications with Defendant's Website. "Though written in terms of wiretapping, Section 631(a) applies to Internet communications. It makes liable anyone who 'reads, or attempts to read, or to learn the contents' of a communication 'without the consent of all parties to the communication.' *Javier v. Assurance IQ, LLC,* 2022 WL 1744107, at *1 (9th Cir. 2022).

77. The spyware embedded into the chat feature of Defendant's Website to record and eavesdrop upon Plaintiff's communications qualifies as a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct alleged herein.

78. At all relevant times, Defendant intentionally caused the internet communication between Plaintiff and Defendant's Website to be intercepted during

transmission and recorded.  Defendant also aided, agreed with, employed, or conspired with Asapp to eavesdrop upon such conversations during transmission and in real time.

79.     Plaintiff sent a pre-filing demand letter notifying Defendant regarding the combined wrongdoing of both Defendant and Asapp, but Defendant did not respond by taking remedial action to eliminate the wrongful conduct.  At minimum, Defendant's conduct may be considered intentional because it had been made aware of its wrongdoing and the wrongdoing of its chat provider by the foregoing pre-filing demand letter, but has taken no remedial action to eliminate the wrongdoing.  *See Doe v. Meta Platforms, Inc.*, 690 F. Supp. 3d 1064, 1076 (N.D. Cal. 2023) (Orrick, J.) (citing *Lopez v. Apple, Inc.*, 519 F. Supp. 3d 672, 684 (N.D. Cal. 2021) (White, J.) ("At the pleading stage, … interception may be considered intentional 'where a defendant is aware of the defect causing the interception but takes no remedial action.'") (quoting *In re Google Assistant Privacy Litig.*, 457 F. Supp. 3d 797, 815 (N.D. Cal. 2020) (Freeman, J.))).

80.     In numerous materially identical cases, courts have held that the above-described allegations state viable claims for violations of section 631(a) of the Penal Code.

81.     Therefore, Plaintiff and class members are entitled to the relief set forth below.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief against Defendant:

1. An order certifying the class and making all appropriate class management orders;

2. Statutory damages pursuant to CIPA;

3. Reasonable attorneys' fees and costs; and

4. All other relief that would be just and proper as a matter of law or equity, as determined by the Court.

## <u>PLAINTIFF HEREBY REQUESTS A TRIAL BY JURY</u>

Dated:  August 21, 2025                    **LAW OFFICES OF TODD M. FRIEDMAN, P.C**.

                                        By:    _/s/ Todd M. Friedman_
                                               Todd M. Friedman, Esq.
                                               Attorney for Plaintiff

**SECOND AMENDED CLASS ACTION COMPLAINT**

## <u>CERTIFICATE OF SERVICE</u>

Filed electronically on August 21, 2025, with:

United States District Court CM/ECF system

Notification sent electronically on this August 21, 2025, to:

Honorable Josephine L. Staton
United States District Court
Central District of California

And all counsel of record as recorded on the Electronic Service List.

s/Todd M. Friedman
Todd M. Friedman

**SECOND AMENDED CLASS ACTION COMPLAINT**